IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


RICHARD CAMPBELL, JOHN            )
DAVIDSON, JOHN MORAN, and
PAUL SHEARD,                      )

                Plaintiffs        )

        v.                        )            No.  3:06-cv-047
                                               (Phillips/Shirley)
LOCKHEED MARTIN ENERGY            )
SYSTEMS, INC. and WACKENHUT
SERVICES, INC.,                   )

                Defendants        )


## MEMORANDUM OPINION


        This is a race discrimination in employment action brought by four

hourly-paid unionized employees pursuant to 42 U.S.C. § 2000e, *et seq.,* [Title VII]

and 42 U.S.C. § 1981, arising out of their employment as security guards at the Y-12

Plant in Oak Ridge, Tennessee.  The employment of three of the four plaintiffs

stretches back over 30 years into periods where neither defendant in this case was

their employer.  They complain that they have been subjected to a racially hostile

work environment first by defendant Lockheed Martin Energy Systems, Inc.

(Lockheed Martin) and later its successor as security forces contractor at Y-12,

defendant Wackenhut Services, Inc. - Oak Ridge (Wackenhut).  They claim

discrimination on account of their race (black) in promotions, job assignments, other terms and conditions of their employment, and the perpetration over years of a racially hostile work environment. Currently pending are motions for summary judgment of both defendants with respect to all four of the remaining plaintiffs [Court Files #7, #9, #11, #13, #15, #17, #19, #21, and #23]. For the reasons that follow, each of those motions will be granted and this action dismissed.

I.

***Factual Background***

The following factual allegations are considered in the light most favorable to the plaintiffs.

This case involves the Y-12 Plant in Oak Ridge, Tennessee, and the security guards who protect it. The Y-12 Plant is situated on over 800 acres of land and contains some 250 buildings that house approximately seven million square feet of laboratory, machining, dismantlement, and research and development areas. The armed protective forces at Y-12 guard the Nation's largest single storage of weapons-grade uranium. Without a doubt, the security of the Y-12 Plan is vital to national security.

The Department of Energy has always contracted out the security services for the Y-12 Plant. From the late 1940s until 1984, Union Carbide Corporation was the managing and operating contractor. In 1984, pursuant to a contract with the Department of Energy, Martin Marietta replaced Union Carbide. In 1995, Martin Marietta's parent corporation merged with Lockheed Corporation, at which point the name of the operating contractor was changed to Lockheed Martin. Effective January 10, 2000, the Department of Energy awarded Wackenhut the contract to perform the security and related support services at Y-12. As of January 10, 2007, Wackenhut replaced Lockheed Martin insofar as providing security and related support services is concerned. It is undisputed that Wackenhut and Lockheed Martin are totally separate companies, although at the time of the change-over in 2000, many of the former Lockheed Martin employees, both supervisors and others, including the four plaintiffs in this case, were hired by Wackenhut.

The work done by security guards at Y-12 - Security Police Officers (SPOs) and Security Officers (SOs), as they are officially called - is subject to extensive DOE regulations that apply to protective force personnel at government-owned facilities like Y-12. *See* 10 CFR Part 1046. This regulation requires SPOs to meet certain physical fitness and other requirements, at specified intervals, to maintain their status. The International Guards Union of America, Local 3 (Guards Union) represents the hourly paid guards at Y-12. Its members are "guards" as

defined in the National Labor Relations Act, as amended, 29 U.S.C. § 151, *et seq.* As such, they cannot be represented by a labor organization that represents employees other than guards. At all times material to this case, the employment of the four guards has been covered by a collective bargaining agreement (CBA) between the guards union and their employer, formerly Lockheed Martin and now Wackenhut. On occasion, guards who initially work in positions covered by the CBA, including two guard plaintiffs previously in this case, James Clark and Paul Moore, move into supervisory positions outside the bargaining unit covered by the CBA.

Wackenhut's CBA with the guards union covers security guards in three bargaining unit classifications: Security Police Officers III (SPO-III), Security Police Officers-II (SPO-II), both armed guards, and Security Officers (SOs), who are unarmed guards. The same is true of the CBAs that Lockheed Martin had with the guards union. In general terms, the SPOs and SOs are responsible for providing physical security for the Y-12 Plant; for providing protection for DOE property and classified material; for providing protection for special nuclear materials from theft, fire, sabotage, or unauthorized detonation; and for planning and executing work in a safe manner in accordance with applicable safety rules and regulations.

Guards are hired as armed guards or SPO-IIs, the classification that has a higher rate of pay than the SO classification. An SPO who is unable to meet the

requirements of DOE regulation 10 CFR Part 1046 is automatically reclassified as an SO as provided in the CBA. The employee remains an SO provided he/she has sufficient seniority, or until he meets the requirements, at which point the employee is reclassified in the SPO-II classification.  If there are more SOs than there are positions for SOs, the SO (or SOs as the case may be) with the least seniority are given, pursuant to the CBA, a "ninety-day letter" which requires the SO to requalify as an SPO or find another job within the ninety-day period.  If the employee can do neither, the employee is terminated.  For example, guard plaintiff Sheard, originally an SPO, has been an SO since 1993.  Due to work-related injuries, Sheard has not attempted to requalify as an SPO since 1993.  Guard plaintiffs John Davidson and John Moran were SOs for over ten years;  both are now specially classified as SPO-IIs because of their armorer jobs.  All SOs and SPOs are required to maintain a Q-clearance, or security clearance, as a condition of their employment.

Throughout the years that Lockheed Martin and Wackenhut have been DOE's security contractors at Y-12, they have continuously promoted and implemented principles of Equal Employment Opportunity (EEO), Affirmative Action (AA), and diversity in all aspects of employment.  Both have implemented and publicized internal complaint procedures which they have used to encourage employees to resolve any kind of employment-related concern they might have, including harassment and hostile work environment concerns.  Lockheed Martin's

Employee Concerns / Response Program, adopted in 1988, was described in

LMES's 1995 Affirmative Action Plan:

> A key principle of [LMES]' Values and the Corporate Code of Ethics and Standards of Conduct is that all individuals have the opportunity to raise concerns and make disclosures without fear of retribution. [LMES] is committed to providing an environment where people feel free to speak out on issues or concerns including health, safety, environment, waste, fraud, abuse, harassment, misconduct, unfair treatment, etc. Each person in [LMES] has a responsibility to surface concerns that arise in the workplace and should be assured that these concerns will be addressed in a responsible, timely, and confidential manner.
>
> We are constantly trying to improve all of our activities, and the Employee Concerns Program is no exception. In an effort to be sure that all employees know that their concerns and suggestions will be taken seriously and feel free to voice them, we have instituted a new Employee Concerns / Response Program. We believe that dealing with employees' problems as concerns and not treating them as "complaints" is an important change in the way we do business. To make it easier for individuals to raise concerns of all kinds, we have adopted a single form to document issues and to help assure feedback and follow-up. A letter was sent to each employee explaining the new process and articles were featured in the Energy System News and News Wire.

Declaration of Gail Sewell, Appx. ¶ 9.

The Lockheed Martin Employee Handbook also contained a section

entitled "Employee Concerns Response Program" which says in part:

> You are encouraged to address suggestions and concerns regarding safety and health, environmental protection, ethics, equal employment opportunity/affirmative action (EEO/AA), sexual harassment, and other issues relating to the workplace. Within 180 calendar days from when the concern occurred, you should contact your direct manager or the next appropriate level of line management. Concerns can be reported orally or in writing, using an Employee Concern Response Program form (UNC-19937), and anonymous reporting and concerns consulting are available by calling one of the numbers below.

*See* Sewell Affidavit, ¶ 10. The Lockheed Martin Employee Handbook listed various telephone numbers that employees could call in order to express concerns and described several other ways for employees to express concerns, without fear of "intimidation, retribution or reprisal." Lockheed Martin also disseminated its Equal Employment Opportunity / Affirmative Action Plan internally and externally in many different ways. Management officials were required to attend training sessions with employees and to participate in additional training tailored to supervisors. During each EEO/AA training session, Lockheed Martin's commitment to a strong policy prohibiting racial discrimination and harassment was communicated to all employees.

James M. Barnes, an African-American, was Director of Lockheed Martin's Workforce Diversity Organization. As Barnes informed the EEOC, "Affirmative action is not merely a policy at Lockheed Martin, it is the practice."

7

Barnes Affidavit at ¶ 4. In addition to Barnes, Lockheed Martin's EEO / Workforce Diversity Organization was comprised of four workforce diversity managers and 43 diversity representatives at Oak Ridge in 1998. In September 1998, three of the four workforce diversity managers were black. At the same time, there were 43 workforce diversity representatives, of whom 19 were black.

Due to budget-driven reductions in force in the 1990s, the number of guards (SPO-IIIs, SPO-IIs, and SOs) at Y-12 decreased from 420 in September 1995 to 356 in September 1999. Despite these force reductions, the percentage of minorities and African-Americans employed as guards at Y-12 remained virtually constant at slightly over 20%.

With respect to promotions, Lockheed Martin implemented policies and programs designed to assist incumbent employees in increasing the level of their training and education so as to enhance their opportunity for promotion. Each program, although not available to all employees, has proven helpful to many minority employees. In 1990, Lockheed Martin formalized a Job Opportunity System (JOS) for non-exempt salaried positions. Under the JOS, employees were notified when vacancies in non-exempt salaried positions occurred so that they could apply if they wished to and obtain counseling, upon request, if they were not selected for the job. The Job Advertising System (JAS) for exempt salaried employees, adopted

in 1994, formalized the existing practice of advertising internally (bulletin boards and electronic media) so that employees could express an interest in available job openings for purposes of promotion, career planning and career development. These two programs were merged in 1999. Many hourly paid employees who worked in the bargaining unit, including African-Americans, covered by the CBA were promoted to salaried positions outside the bargaining unit. There were no promotions, as such, within the bargaining unit itself. So long as protective force personnel chose to remain in the bargaining unit, they were classified either as SPO-IIs or SPO-IIIs or SOs, and the terms and conditions of their employment were governed by the CBA. All of Lockheed Martin's CBAs at Y-12 contained strong anti-discrimination provisions which were enforceable under the CBAs' grievance and arbitration clauses and through the company's EEO organization. Under the Employee Concerns / Response Program, employees could and did challenge initial job selections if they believed the selection was discriminatory.

Lockheed Martin also provided an annual performance appraisal for each employee. The appraisal forms provided a space in which the salaried employees were encouraged to identify any condition, such as discrimination or harassment, that negatively impacted their job performance.

The Workforce Diversity / EEO Organization was part of Lockheed Martin's Human Resources Organization. Its Director was James Barnes. Additionally, each Lockheed Martin division had its own Affirmative Action Representative, who received on-going training and worked as a liaison between the Division Managers and the Workforce Diversity / EEO Organization in identifying issues and concerns.

Lockheed Martin's actions with respect to the EEO/AA were also monitored externally by DOE. Lockheed Martin was required to submit an annual "EEO/AA Plan" to DOE.

On January 10, 2000, when Wackenhut began operations under its contract with DOE, Wackenhut transitioned 350 Security Police Officers and Security Officers. Upon their transition into employment by Wackenhut, these employees occupied four classifications: Security Police Officer-I (SPO-I), Security Police Officer-II (SPO-II), Security Police Officer-III (SPO-III), and Security Officer (SO). Employees in the SPO classification who did not work at Y-12 and were promptly converted to the SPO-II classification by Wackenhut. SPO-IIs are classified as armed, defensive, combative personnel. *See* 10 CFR § 1046.3. SPO-IIIs are members of the Special Response Team and are classified as armed, offensive, combative personnel. *Id.* To become an SPO-III, one must already be employed

as an SPO-II and must pass an additional training course designed to provide skills necessary to perform Special Response Team duties. SOs are unarmed guards who are former SPO-IIs or SPO-IIIs and who became no longer able to meet the physical fitness, weapons qualifying, or other DOE-mandated requirements to be an armed SPO. Of the 350 SPO and SO transitional employees, 69 were African-American, four were Hispanic or American Indian, and 276 were Caucasians. Thus, 19.7% of Wackenhut's starting SPO-II, SPO-III, and SO employees were African-American and 20.9% were minorities.

Wackenhut also states its commitment to Equal Employment Opportunity (EEO) and Affirmative Action (AA) in its policies. Each version of its policy provides, "All personnel actions are effected without regard to race, color, ... in accordance with the following." It also provides an annual AA Plan submitted to DOE. The terms and conditions of employment of bargaining unit personnel, such as SPOs and SOs, who were transitioned from employment by Lockheed Martin to Wackenhut, were also governed by the collective bargaining agreement between Lockheed Martin and the International Guards Union of America (IGUA). Its first CBA prohibited discrimination by either the employer or IGUA on the basis of race or color. It provides that any employee may discuss with his or her superiors any matter that he or she feels requires adjustment. The first CBA provides a multi-step grievance procedure addressing all complaints, disputes, or misunderstandings

involving questions of interpretation or application of any provision of the CBA. The second CBA between Wackenhut and IGUA, in effect between November 15, 2001, and November 15, 2006, provides similar non-discrimination and grievance provisions. Wackenhut has filed annual diversity reports with DOE since 2000. The 2005 diversity reports demonstrate that Wackenhut has put a significant effort into promoting diversity not only in recruiting and hiring, but across the board in its efforts to maintain a diverse workforce.

DOE's oversight of Wackenhut's diversity results, including regular review of the results of SPO recruiting and hiring, is also demonstrated in a semi-annual award fee termination process. Under the DOE contract, Wackenhut does not receive a guaranteed fee for its performance. Rather, the award fee is based on performance against objectives that DOE establishes on a semi-annual basis. After the evaluation period, Wackenhut provides DOE with its semi-annual evaluation of performance against the objectives, DOE, and now the National Nuclear Security Administration (NNSA), grade Wackenhut's performance in each category and the resulting grades are tallied to determine the award fee. The Human Resources and Labor Relations performance objectives make up 5% of the award of the fee. The statistics for 2005 revealed that while only 7% of the applicants of a known race were minorities, 11% of the officer positions went to the minorities.

Wackenhut contends that it is committed to immediate and appropriate preventive and corrective action upon learning of racial discrimination, including verbal or written reprimands, suspensions, demotions, or terminations, in accordance with its written policy. Wackenhut purports to take all claims of harassment seriously and takes prompt remedial action whenever a violation is found. Promotions to salaried and usually supervisory positions outside of the collective bargaining group are determined through an interview process with employees' work records a consideration. An employee who is currently being disciplined cannot apply for a promotion. Selection of job assignments within the CBA are determined by seniority in most cases. Occasionally, special assignments during the day are given to SOs who have lost their SPO-II status because of failure to meet the physical demands, so that they have access to exercise equipment during the day.

It is undisputed that all four plaintiffs who remain in this case were familiar with the complaint or grievance procedures both through their employer's EEO programs and through their union's grievance procedures. In fact, on several occasions throughout the years they have taken advantage of those procedures.

Because of the security concerns at Y-12, drug testing of the security guards is an important consideration. The record is undisputed that, despite some

unsubstantiated suspicions by the plaintiffs, this drug testing is carried out in a completely random basis. For example, in January 2000, Wackenhut entered into a contract with NetGain Corporation to manage and handle the drug testing of Wackenhut employees. To select Wackenhut SPOs and SOs for drug testing, NetGain uses each work day the PSAP/HRP Random Selection Database Process provided by Fastech, Inc., a separate unaffiliated contractor corporation, to select randomly for drug testing Wackenhut's security personnel. In essence, NetGain asked the PSAP/HRP Database to select 10 to 25 Wackenhut employees for drug testing, without specifying in any manner the identity, race, or gender of any such employees to be selected. The system then randomly selects personnel for testing based on the individual's last test dates. Once selected, such individuals are contacted and tested, and eventually made available in the random selection pool one month following their test. The database structure does not contain either gender or ethnic information relative to any member included in the database. One using the database for purpose of selection of security personnel for drug testing receives a list of such personnel selected randomly according to their last drug test dates, and not selected according to race or gender.

Many of the complaints from the four plaintiffs have common themes and, for the sake of simplicity, the Court has divided them into the following subgroups:

(1)        Claims of unequal or discriminatory discipline;

(2)        Excessive drug testing of blacks;

(3)        Inadequate promotion opportunities;

(4)        Unfair distribution of overtime hours (either too much mandatory overtime or not enough voluntary overtime);

(5)        Unequal or unfair job assignments;

(6)        Racial harassment by co-workers such as graffiti, racist jokes, and name-calling;

(7)        A general allegation of a denial of the opportunity to work in an integrated environment with black supervisors;  and

(8)        Miscellaneous claims that relate to specific individual plaintiffs.

II.

### *The Individual Plaintiffs*

A.  Richard Campbell

Plaintiff Richard Campbell graduated from high school in Knoxville in 1978 and attended college until 1983 without getting a degree.  In 1991, Lockheed Martin (then Martin Marietta) hired Campbell to work as a security guard at Y-12. Since then, he has worked continuously at Y-12 either as an SPO, an armed guard, or as an SO, an unarmed guard.  Campbell was employed from 1991 to January 9,

2000, by Lockheed Martin, and from January 10, 2000, to date by Wackenhut. During Campbell's employment with Wackenhut, he has occasionally been classified as an SO because he did not meet the requirements of DOE's federal regulations, but otherwise he has been classified as an SPO-II and has worked in SPO-II positions throughout his employment. Campbell has never applied for a promotion.

B. John Davidson

Davidson graduated from high school in 1968. In 1969, he was employed by Y-12 at Union Carbide until 1984, whereupon he became an employee of Lockheed Martin and remained such until January 2000, when he became an employee of Wackenhut. Throughout his employment at Y-12, Davidson has worked in an hourly-paid security guard position. He has never applied for a job outside of the bargaining unit.

C. John Moran

Plaintiff John Moran graduated from high school in 1969. Union Carbide hired him to work as a guard in 1971. Since then he has continuously worked at Y-12 for Union Carbide, then Lockheed Martin, and finally Wackenhut from 2000 to today.

All of Moran's work at Y-12 has been in an hourly-paid, uniformed security guard position covered by a CBA between the International Guards Union and the above employers. When Moran became a Wackenhut employee in 2000, he was an unarmed SO and had been since 1989. Wackenhut soon assigned him to a post in the Y-12 Visitors Center, a job more sedentary than Moran's previous assignment at Post 5, a main Y-12 ingress/egress portal. Then in 2003, Moran and his co-plaintiff John Davidson successfully bid on jobs as SPO-II-Armorers, a job Moran testified he enjoyed.

When he became an armorer, Moran received a considerable amount of training, both in Oak Ridge and at the DOE's Central Training Facility in Albuquerque, New Mexico. Moran also was due, as an employee categorized as an SPO-II, to receive a raise from his previous SO status per the CBA. Moran's supervisor, Stan Justice, testified that he asked Steve Gibbs, the Director of Protective Force Operations, to give Moran and Davidson the raise before they completed the full battery of armorer training, even though candidates had been advised that as SOs they would retain their pay rate "until fully trained and qualified as an armorer", and Wackenhut granted that request. Consequently, Moran's base hourly pay rose from $16.38 an hour to $19.10 an hour.

D.   Plaintiff Paul Sheard

Plaintiff Sheard was born in 1950 and graduated from high school in 1969.  He attended Knoxville College from 1970 to 1974, but did not earn a degree. In 1977, Union Carbide hired Sheard as a guard in the Protective Forces Organization at Y-12.  Since that time he has continuously worked for Y-12 throughout his employment with Lockheed Martin and Wackenhut.  Sheard has worked in an hourly-paid security guard position covered by the employer's CBA with the guards union.  Sheard has never applied for a job outside of the bargaining unit.

III.

***Summary Judgment Standards***

Pursuant to Rule 56, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  In assessing the validity of a summary judgment

motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in a light most favorable to the opponent of the motion. However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. *Catrett*, 477 U.S. at 322.

One method of obtaining summary judgment is to show that the plaintiff will be unable to meet his burden of proof on an essential element of his case. As the *Catrett* Court declared, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be no "genuine issue of any material fact," since a complete failure of proof concerning an essential element of the non-

moving party's case necessarily renders all other facts immaterial. 477 U.S. at 322-23.

The moving party has the burden of showing an absence of evidence supporting the non-moving party's case. Once this burden is satisfied, in order to defeat summary judgment, the plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Conclusory allegations are insufficient to defeat summary judgment. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990) ("The object of this provision is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit"). Rather, the plaintiff must set forth "specific facts," and only disputes over facts that might "affect the outcome of the suit under governing law" will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

In employment discrimination cases, summary judgment cannot be defeated by questioning the wisdom of the employer's business judgment. *See, e.g., McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160-62 (6th Cir. 1990). The plaintiff "must provide evidence not that the defendant could have made a business decision that others might think is more fair, but that the defendant made its decision because of plaintiff's membership in a protected class." *Norbuta v. Loctite Corp.*, No. 98-4162, 2001 U.S. App. LEXIS 459, at p.*25 (6th Cir., January 8, 2001).

Inadmissible evidence may not be considered in ruling on a motion for summary judgment. *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). While the evidence produced in response to a motion for summary judgment does not have to be produced "in a form" that would be admissible at trial, it must at least be presented in the kinds of evidentiary material listed in Rule 56(c), Federal Rules of Civil Procedure. *Catrett*, 477 U.S. at 324.

## IV.

### *Exhaustion of Remedies and Statutes of Limitation*

The complaint in this case was filed on December 28, 2001. Any of the plaintiffs' claims arising out of discreet matters occurring before December 28, 1997, are therefore time-barred since they precede the longest possible statute of limitations, which is the four-year statute for claims of race discrimination under 42 U.S.C. § 1981, created by the Civil Rights Act of 1991. *See Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004). Furthermore, Title VII claims are often barred by failure to file a timely EEOC charge. *See Nat'l. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002). The Supreme Court in *Morgan* held that "the statute precludes recovery for discreet acts of discrimination or retaliation that occurred outside the statutory time period." 56 U.S. at 105. "The Supreme Court has elsewhere held that the Title VII administrative charge filing period is functionally

equivalent to a statute of limitations." *Kinley v. Norfolk Southern R.R. Co.*, 230 F. Supp. 2d 770 (E.D. Ky. 2002) (citing *Zipes v. TransWorld Airlines, Inc.*, 455 U.S. 385, 393-95 (1982)).

The *Morgan* Court remarked that "Title 42 U.S.C. § 2000e-5(c)(1) is a charge filing provision that 'specifies with precision' the prerequisites that a plaintiff must satisfy before filing." 536 U.S. at 109. The Court further declared:

> [a]n individual must file a charge within the statutory time period and serve notice upon the person against whom the charge is made. In a state that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency has filed the charge with the EEOC within 300 days of the employment practice; in all other states, the charge must be filed within 180 days. A claim is time-barred if it is not filed within these time limits.

*Id.* Discreet acts include termination, failure to promote, denial of transfer or assignment, or refusal to hire. 536 U.S. at 114.

A.  Unequal Discipline

Several of the plaintiffs claim that they have been subject to unequal discipline to that given to white employees. Lockheed Martin's disciplinary procedure was comprised of five levels of discipline: the first level was "coaching and counseling;" the second an "oral reminder;" the third a "written reminder;" the fourth a "decision making leave" or "DML" as it was usually called; and the fifth and

final step was "termination." *See* Declaration of Steven Gibbs at ¶ 9. An oral reminder remained for six months on the employee's record; a written reminder for nine months, and a DML for one year. At the end of those periods, Lockheed Martin "deactivated" the discipline. *Id.*

Plaintiff Richard Campbell was the only one of the four plaintiffs who had any significant disciplinary measures taken against him during his employment at Y-12. Campbell had attendance problems beginning as early as 1991 and continuing throughout much of the 1990s. On December 15, 1991, Campbell was given an oral reminder after failing to report for his regular shift and an overtime shift on November 19, 1991, for failing to call in and report his absence. His excuse for not reporting or calling in was that he had fallen asleep in his truck while waiting for a friend. That excuse was unacceptable. *See* Campbell Deposition, pp.56-57. On April 4, 1992, Campbell called his supervisor to report that he was late for work, but he did not report or call back to explain his absence. This resulted in a written reminder in June 1992, which remained active in his personnel file for nine months as provided by Lockheed Martin policies. On November 25, 1992, Lockheed Martin informed Campbell that his "absences were excessive and [his] frequency rate was high" for the calendar year 1992. On December 8, 1992, he was given an oral reminder for another unexcused absence. He continued to have attendance problems in 1993. On January 28, 1993, Lockheed Martin sent Campbell a letter stating that his

absences had been excessive; that his frequency well below the plant average; so that he would henceforth "be required to show proper [physician's] certification for all future illnesses." To comply with this requirement, as the letter explained, a physician certification had to state that Campbell was not able to work on the day(s) in question.

On June 17, 1993, Campbell was given another written reminder for being absent without excuse for four days in May 1993. On this occasion, Lockheed Martin agreed to withdraw two of the unexcused days and to change them to personal leave, but the other two days remained unexcused. On November 21 and 22, 1993, Campbell failed to report to work. He did not report on November 23, 1993, but during the shift a supervisor found him sleeping in a vehicle parked behind one of the buildings at the Y-12 Plant. For these violations, Campbell was given a DML on December 14, 1993. Under Lockheed Martin's policy, the DML, which was the final level of discipline before discharge, remained in effect for one year. At this time the company warned Campbell that it was "giving [him] one last chance to correct [his] attendance, conduct and performance." Campbell Deposition Ex. 11.

On July 23, 1994, Campbell telephoned his supervisor just before he was scheduled to report to work and told him he had "drank too much beer at a picnic and was too sick to report to work." Campbell asked his supervisor to grant

him a vacation day, so that the absence would be excused, but his supervisor denied the request in part due to the fact that it was just 15 minutes prior to work time and also due to the past history of his absentee problems.

On December 14, 1994, Lockheed Martin notified Campbell that the disciplinary action resulting from his December 14, 1993, DML had been deactivated. Two weeks earlier, Campbell had been involved in an off-duty fight unrelated to his employment, but as the result of facial injuries sustained in the fight he was off work on excused absence during all of December 1994 and much of January 1995, during which he nevertheless received 100% of his pay. A dispute arose as to whether his absences on January 11, 12, and 18, 1995, were excused or not and, hence, whether he was entitled to receive full pay for those three days. Campbell's unexcused absences for those three days resulted in the issuance of another DML to him on March 8, 1995.

Campbell disagreed with Lockheed Martin's position regarding the validity of one of his doctor's reports and Lockheed Martin's denial of his claim for sick pay on those days. He therefore filed two grievances under the CBA. One of his grievances maintained that he was entitled to the sick pay because the doctor's excuses were valid. The other took issue with the DML issued on March 8, 1995. The object of both grievances was to get sick pay for the three days, January 11, 12

and 18, 1995. Lockheed Martin denied the grievances and the guards union declined to take them to arbitration. These were the only grievances Campbell could recall filing while he was employed by Lockheed Martin.

The DML issued to Campbell on March 8, 1995, was deactivated by letter dated March 7, 1996. However, in the meantime, Campbell had filed a race discrimination claim with the EEOC in August 1995, alleging that Lockheed Martin had wrongfully denied him sick pay for those three days because of his race. Campbell's EEOC charge was ultimately settled by the parties' execution of a negotiated settlement agreement and by Campbell's execution of a release dated February 16, 1998. In the settlement agreement, Lockheed Martin agreed to reimburse Campbell for the three days in question and to remove any disciplinary record relating to those three days from Campbell's file. The agreement also provided that Lockheed Martin's execution of the agreement did not constitute an admission by Lockheed Martin that it had violated the law. In return, Campbell executed a document releasing Lockheed Martin from all claims alleged in the charge "or which could have been alleged therein or any claims arising out of my employment." Lockheed Martin maintains that this release bars all of Campbell's claims based on the alleged conduct occurring on or before the date he signed it, February 16, 1998. The Court agrees.

Plaintiff Campbell claims that he was treated differently than other white employees who had similar attendance problems. However, a careful review of the record reveals that Campbell had a serious attendance problem. For example, in the six year period from 1994 to 1999, Campbell was off work (excluding vacation time and holidays) for 2,218.2 hours, which translates into 277.27 eight-hour days or 55.45 five-day work weeks. It is also undisputed that Lockheed Martin and later Wackenhut required all employees who had attendance problems, black or white, to provide doctor's notes to justify their sick leave absences. Plaintiff has pointed to no white employee who has had an attendance problem as serious as his own which has resulted in any less discipline. No reasonable jury could conclude that Campbell was disciplined more harshly than any white employee for similar conduct.

The Court also notes that although Campbell has continued to have attendance problems while working for Wackenhut, he has never been disciplined by Wackenhut. In 2004, Wackenhut cited him for tardiness and absences. A white supervisor named Jay Locke told him that he was at step three of the disciplinary process, but that was later changed to step two. Given Campbell's undisputed attendance problems, no reasonable jury could find that Campbell was disciplined unfairly because of his race.

Plaintiff John Davidson's complaint about unequal discipline concerns an incident that occurred in December 1999, when the Department of Energy made a felony charge against him for submitting false receipts during a paid union vacation. During that period, plaintiff's security clearance was suspended, but no disciplinary action was taken against him by either Lockheed Martin or Wackenhut. It was the Department of Energy that would not reinstate his security clearance. Finally, after Davidson pled guilty and a Wackenhut employee testified on his behalf, his security clearance was reinstated. There is absolutely no evidence in the record that either defendant played any part in the fraud charges that were brought against the plaintiff and, accordingly, no question of material fact remains with respect to this issue. Neither Davidson nor Campbell has indicated that any other discipline has ever been brought against them.

With respect to plaintiff Sheard and Moran, they have never been subjected to any discipline, at least while they have been employed by either of the two defendants.

B. Unequal Drug Testing

The plaintiffs claim that blacks are subjected to drug testing more frequently than whites in the security guard positions. However, the evidence is uncontradicted that the defendants have used a random process for determining

who was to be drug tested and they used a uniform policy of requiring the employee notified that it was time for his/her drug test to be tested within two hours.  No one would dispute that random drug testing of security guards guarding the Y-12 Plant is a necessity.  Nor is there any evidence that any of these plaintiffs have ever failed one of these drug tests.  Under the circumstances, this issue appears to be frivolous.

C.  Inadequate Promotion Opportunities

Plaintiffs next claim that white SPO-IIs and SOs have greater promotion opportunities than blacks.  The Court finds that none of these plaintiffs have standing to raise this issue since none of the four have ever applied for a job outside the bargaining unit.  The Court notes that when they have applied for jobs within the same classification which might pay more, they have been successful.  For example, when Davidson and Moran bid on the armorer job in October 2002, a higher paying job covered by the CBA that SOs are eligible to hold, Wackenhut awarded them those jobs effective January 2003 based on their seniority.  This is totally consistent with the defendants' contention that the bidding of jobs within the bargaining unit itself is governed completely by the CBA.

Plaintiff Davidson claims that he "witnessed" racial discrimination in promotion against other African-American Protective Force employees.  However, Davidson, because he never applied and cannot show that his application would

have been futile, does not have standing to bring a claim of promotions discrimination on behalf of others.

A plaintiff seeking to invoke a federal court's jurisdiction must demonstrate three things to establish standing under Article III. First, he must show that he has suffered an "injury-in-fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Specifically, the asserted injury must arise out of the invasion of a legally protected interest that is sufficiently concrete and particularized rather than abstract and indefinite. *See id.* at 560. Second, the plaintiff must show a causal connection between the asserted injury-in-fact and the challenged action of the defendant. *Id.* Third, the plaintiff must show that it is likely rather than speculative that "the injury will be redressed by a favorable decision." *Id.* at 561. Davidson's failure to promote claim is completely without any support.

D. Unfair Distribution of Overtime Hours

Like many of the issues raised by the plaintiffs, the distribution of overtime hours, as well as shift scheduling, are governed by the CBA under which the plaintiffs have worked. Those issues, to the extent that they have been issues, are issues properly raised in grievance procedures with their union.

The record reveals that there are two types of overtime hours which are at issue: voluntary and mandatory. Voluntary are those hours which an employee, assuming he is in the correct job classification, may apply for and those are divided in a manner intended to equalize the hours of employees. The mandatory hours are those for which no one volunteers and they are assigned to employees based on a list that is maintained. Once an employee works mandatory hours, he is moved to the bottom of the list. Hence, the purpose of the list is to divide the mandatory hours equally. The record is undisputed that this how the system of overtime hours is maintained, and it is carried out in a racially neutral manner. To the extent that the plaintiffs are unhappy with the way a particular decision is made, they have grievance procedures in the CBA to be utilized, and they are all well aware of how to utilize those procedures. I find no evidence in the record that a reasonable jury could use to conclude that the overtime hours, either voluntary or mandatory, are dispensed in a racially discriminatory manner.

E. Unequal Job Assignments

Although the pay and benefits are the same in the SPO-II and SO job categories, plaintiffs assert that there are certain assignments within those categories that are more desirable than others. Plaintiffs claim that the more desirable jobs are given to the white employees. Some of the jobs plaintiffs list as

falling in this category are escort, clothing job, guard at Portal 5, and dog handler job. The Court notes that many of these jobs are simply temporary assignments.

Upon a careful review of the record, the Court finds that the assignment of these jobs was not done in a racially discriminatory manner. The dog handler job was a temporary assignment that was scheduled whenever an uncleared dog handler needed to be escorted into the Y-12 Plant. The defendants have presented evidence that during a representative period when this occurred, between October 31, 2001, and March 19, 2003, 86 SPOs were assigned to escort uncleared dog handlers. Of those 86 assignments, 25 were assigned to African-American SPOs. Accordingly, it is clear that the assignment of this temporary job went to black SPOs in a proportion similar to that of their proportion of the SPO population.

Another job which was thought by some to be less stressful and therefore desirable was the "clothing job." Until 1997, it was held by a white SPO who retired at that time. It was then offered to four employees, three of whom were black, who turned it down. There is simply no evidence that the assignment of this job, assuming it was more desirable to some SPOs, was dispensed in a discriminatory manner.

On occasion, SPOs "escorted" certain uncleared visitors around the Y-12 complex. These visitors might be dignitaries. There is no statistical evidence presented to demonstrate that these escort jobs were handed out on a discriminatory basis. In the past, both black and white SPOs have performed this function. It is only the speculation of some of these plaintiffs that the job is given more often to whites.

Finally, certain job assignments within the Plant are subjectively considered more desirable for certain employees. For example, plaintiff Sheard claims that he requested to be assigned to Portal 5, which was a busier location and therefore more interesting. He complains because this transfer was given to a female employee, Jamie Mantooth, in 1997. However, it is undisputed that plaintiff John Moran, who is also black, was assigned to Portal 5 and he requested a number of times to be removed from it.

The Court concludes from the above that the desirability of most, if not all, of these assignments was simply subjective. Certainly, there is no concrete evidence in the record upon which a jury could conclude that these assignments were passed out in a discriminatory manner.

F.  Racial Harassment

Perhaps plaintiffs' most serious claim is that the defendants have maintained a racially hostile work environment.  Title VII prohibits racial harassment that creates a hostile or abusive work place.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993);  *see also Newman v. Federal Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001).   A work place environment is hostile or abusive when it "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the condition of the victim's employment."  *Id.*  "The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiffs' position, considering 'all the circumstances.'"  *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81 (1998).

To insure that Title VII does not become a "general civility code for the American workplace," *id.*, the Supreme Court has repeatedly emphasized that courts must pay "careful attention to the requirements of the statute."  *Id.*  Thus, "Title VII does not prohibit all verbal or physical harassment in the workplace;  it is directed only at discrimination because of race."  *Id.*

To establish a *prima facie* case of hostile work environment, a plaintiff must prove five things:

<table>
<tr><td>(1)</td><td>That he is a member of a protected class;</td></tr>
<tr><td>(2)</td><td>That he was subjected to unwelcome racial harassment;</td></tr>
<tr><td>(3)</td><td>That the harassment was based on race;</td></tr>
<tr><td>(4)</td><td>That the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile or offensive work environment;  and</td></tr>
<tr><td>(5)</td><td>The existence of employer liability.</td></tr>
</table>

*Newman*, 266 F.3d at 405.  The totality of circumstances should be considered when determining whether a hostile work environment exists.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).  Circumstances requiring consideration on the issue of whether conduct unreasonably interferes with work performance or by creating an intimidating, hostile or offensive work environment include:  the frequency of the discriminatory conduct;  its severity;  whether it is physically threatening or humiliating, or a mere offensive utterance;  and whether it unreasonably interferes with an employee's work performance.  *Newman*, 266 F.3d at 405.

Further, to be actionable, a racially objectionable environment must be both objectively and subjectively offensive:  one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.  *Faragher*,

524 U.S. at 787. A workplace that is actionable is one that is "hellish" because of the employee's protected class. *Baskerville v. Culligan Int'l. Co.*, 50 F.3d 428, 430 (7th Cir. 1995), *cited with approval, Black v. Zaring Homes*, 104 F.3d 822, 826 (6th Cir. 1997).

The racial harassment of which the plaintiffs complain extends from the period when three of them first began working at Y-12 in the early 1970s and extends for more than 30 years. It consists primarily of (1) graffiti in the form of racial epithets in the changing room and restroom; (2) racial jokes; and (3) racial slurs or nicknames. Plaintiff Sheard contends that in the early 1970s, a white employee named Randy Jones called him "nigger" nine times. This resulted in a shoving match between Jones and Sheard, and they were both suspended for one day. About this same time, someone wrote on Mr. Sheard's notebook, "Nigger Paul's Notebook." These incidents occurred more than 30 years ago and at a time when neither of the defendants employed the plaintiffs. Sheard also testified that sometime apparently after Tiger Woods won the 1997 Masters golf tournament, a white employee asked several of the black employees whether they were eating "collard greens and chitlins." Sheard also testified that he had heard that sometime in the year 2000, a white employee named Joe Lackey asked a black employee named James Clark whether the black-owned clothing line "FUBU" meant "Fucked Up Beyond Understanding."

Further, Sheard testified that he had heard that Chief Steve Gibbs once referred to some black employees as "you boys."  The only explanation in the record for this statement is Chief Gibbs' own statement that he did not say that and that he might have been referring to "East Side Boys" as a friendly term for the other employees who grew up on the same side of Knoxville that he did.  Sheard testified that he had seen racial epithets written as graffiti in the changing room and men's restroom up until 1996, but that whenever management was notified of it, it was painted over.

Plaintiff Davidson testified that he had seen the word "nigger" written in the men's bathroom as late as 1999 and at other numerous times and occasions. He testified that he complained about it but it was not removed for several weeks.

He also testified that in the fall of 2001, he heard a white employee named Lee Hopkins use a racial epithet.  However, it is undisputed that Hopkins was not a Wackenhut employee, but worked for another company, and that when his comment was complained about, he was disciplined.

Plaintiff John Moran testified that he is still seeing racial graffiti within the last three or four years.  Plaintiff Campbell claims that in 1999 or 2000 he still saw the word "nigger" engraved in stalls throughout the Plant, and it remained there for

quite some time. Plaintiff Campbell also says that in May of 2003, he saw a piece of rope that he thought was a "hangman's noose" in a building at Y-12 that was under the control of BWXT. Campbell immediately notified his supervisor, who promptly took the rope down and then filed a complaint under Wackenhut's internal concerns procedure. This is the one and only time that Campbell saw the rope. BWXT conducted an investigation and determined that the rope had been used at times to loop around a door knob to hold a door open and had no racial implications. The rope was never used that way again.

With respect to the graffiti, the defendants set out in the deposition of Mike Bradshaw the steps they took when the graffiti was found. Mr. Bradshaw testified in his deposition that, in the mid-1990s while he was the LMES Manager of Protective Forces at Y-12, he learned that racial graffiti had been found in the change house. As soon as it was reported, it was promptly removed. The company was unable to find out who had written the graffiti on the wall. At this point, Bradshaw instructed supervisors to walk through the change house at the beginning of each shift and throughout the day to check for graffiti and to have it removed or painted over if any was found. He claims that he also announced to the employees at every guard mount that writing graffiti was unacceptable conduct, would not be tolerated, and that anyone found to have written racial graffiti would be disciplined.

The testimony of Steve Gibbs, Chief of Protective Forces at Y-12, confirms Bradshaw's testimony on these points.

Another employee named Mike Heidle was asked in his deposition to guess how many times he had seen racial graffiti in the restrooms since he began employment at Y-12 in 1975. Heidle guessed he had seen it "twenty, thirty [times], maybe, I don't know." When he was asked when he last remembered seeing it, he said, "It's been awhile."

Plaintiff Campbell testified that a white employee named Floyd Glenn made a comment in 2001 which occurred right after the Tyson/Hollifield boxing match. Glenn allegedly said to Campbell, "I know you brothers like ... pig feet ... I [didn't] know you like ears." It is undisputed that Lockheed Martin disciplined Glenn after the remark and later terminated him in February 1998 as the result of another incident. It is undisputed that the Tyson/Hollifield boxing match which precipitated the comment occurred in 1997 and not in 2001 as Campbell stated.

Campbell alleged that white employees "who support African-American employees" are given less desirable job assignments. When asked about that allegation, Campbell referred to a white employee named Steve Ballard, who is said to have switched jobs with black employees when they were given worse

assignments.  Campbell alleged that once the white employees noticed that Ballard was switching his favorable jobs with African-Americans who were assigned undesirable jobs, they stopped assigning Ballard those jobs.  However, Campbell's testimony in this regard was vague and he was unable to identify particular times and instances when this occurred, nor did he know whether it occurred more than one time with a black employee named Charlie Branner.  Nor did Campbell know whether Mr. Ballard got permission of supervisors before switching jobs.

Plaintiff Sheard also referred to two incidents in which a white SPO named Chuck Foust is said to have called SPO Paul Thomas (black) and SPO Earl Campbell (black) "Buckwheat."  It is undisputed that Wackenhut management had no knowledge of this alleged incident.

The Court has considered these remarks and jokes and the existence of this graffiti over this more than 30-year period and finds that, even assuming the facts in the light most favorable to the plaintiffs, plaintiffs cannot establish a *prima facie* case of a hostile work environment.  First, the graffiti, jokes and name-calling does not rise to the level of creating an intimidating, hostile or pervasive work environment such that it unreasonably interfered with the work performance of any of the plaintiffs.  The Court has considered the totality of the circumstances.  It is clear that it was infrequent, at least considering the length of time involved.

Accordingly, the Court finds no evidence that it unreasonably interfered with anyone's work performance. Moreover, the Court finds no facts upon which a jury might find employer liability. There were virtually no statements made by any supervisory employees, with the exception of the ambiguous "East Side Boys" statement attributed to Steve Gibbs. Both defendants had in place comprehensive EEOC complaint procedures, and plaintiffs' union had grievance procedures in place. In spite of that, in every case where graffiti was found or a racist comment was overheard, plaintiffs either did not report the offending conduct or word, or some reasonable action was taken by the employing defendant or the union.

Based on the foregoing, considering the totality of the circumstances, no reasonable jury could find that any of the four plaintiffs are entitled to recover for exposure to a racially hostile work environment.

G.  General Allegations

All of the plaintiffs make the general allegation that the defendants' policies "have deprived [them] of the opportunity to work in an integrated environment in which African-Americans hold higher level positions." This general allegation is not supported by the record. Clearly, these plaintiffs work in an integrated environment where the minority population of employees (approximately 20%) is higher than the general population in East Tennessee. Most, if not all of

them, have been supervised by black as well as white supervisors. It should be noted that when Wackenhut took over from Lockheed Martin the operation of the Security Force, five of the nineteen supervisors appointed were black and two were other minorities. It is undisputed that when they want to, black SPO-IIs may apply for and are often awarded supervisory positions outside of the bargaining unit. Not only do the defendants and the plaintiffs' union have procedures by which employees may raise discrimination or other complaints, but the Department of Energy regulates the contract with its security contractors and requires compliance with Equal Opportunity and diversity workplace requirements. Conclusory allegations without any concrete evidence to support them cannot defeat a properly supported motion for summary judgment.

V.

**Disparate Impact and Pattern-or-Practice of Discrimination**

Finally, defendants have moved for summary judgment on plaintiffs' "disparate impact" and "pattern-or-practice" claims. In response, plaintiffs have voluntarily withdrawn their disparate impact claims. With respect to the "pattern-or-practice" method of proof, the United States Court of Appeals for the Sixth Circuit has held "that the pattern-or-practice method of proving discrimination is not available to individual plaintiffs" *Bacon v. Honda*, 370 F.3d 565, 575 (6th Cir. 2004).

However, because the United States Supreme Court has not ruled on this issue, plaintiffs wish to preserve this issue for appeal. This Court is bound by the *Bacon* decision. Accordingly, summary judgment will also be granted with regard to plaintiffs' claims of discrimination under the "pattern-or-practice" method of proof.


## VI.

### *Conclusion*


In light of the foregoing, defendants' motions for summary judgment [Court Files #7, #9, #11, #13, #15, #19, #21, and #23] are hereby GRANTED and this action is DISMISSED.


Enter Judgment Accordingly.

*s/  Thomas W. Phillips*
UNITED STATES DISTRICT JUDGE